```
                                                                                    C/M
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
                                                                 :
MALIK DONADELLE,                                                 :
                                                                 :
                               Plaintiff,                        :
                                                                 :   **MEMORANDUM**
                - against -                                      :   **DECISION AND ORDER**
                                                                 :
COSTAS DIAMANTIS, RAY MORGAN,                                    :   17-cv-1689 (BMC) (RLM)
JUAN BERNAL, and D.C. 9 NY IUPAT,                                :
LOCAL 1974 DRYWALL,                                              :
                                                                 :
                               Defendants.                       :
----------------------------------------------------------------- X
```

**COGAN**, District Judge.

1. Plaintiff *pro se* brings this action for employment discrimination under Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17, ("Title VII") and corresponding provisions of local law, alleging that he was terminated from an apprenticeship program based on racial (black) and religious (Muslim) discrimination. He has named as defendants D.C. 9 NY IUPAT, Local 1974 Drywall ("DC9"), and three individuals who are involved either in the program or work for DC9. DC9 has moved to dismiss the complaint under Rule 12(b)(1) and Rule 12(b)(6). Plaintiff failed to timely oppose the motion, but has belatedly sought an extension of time to oppose the motion. DC9 also seeks an additional extension to file his reply. I deny both motions for an extension of time as moot because, as a *pro se* plaintiff, I have to consider the strongest possible arguments he might have made anyway, see Wager v. Littell, 549 F. App'x 32, 33 (2d Cir. 2014) (citing Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006)), and when viewed in that light, defendants' motion to dismiss must be denied.

2. DC9 first contends that any claims against it for religious discrimination and retaliation must be dismissed for lack of subject matter jurisdiction because plaintiff's EEOC claim mentioned only racial discrimination and retaliation for that discrimination. DC9 correctly cites Holtz v. Rockefeller & Co., 258 F.3d 62, 83 (2d Cir. 2001), which stands for the general proposition that a racial discrimination claim will not exhaust a religious discrimination claim because the former does not fairly put the EEOC on notice to investigate the latter. See also McCahill v. Schottenstein Corp., No. 03-cv-6476, 2005 WL 354486, at *2 (W.D.N.Y. Feb. 15, 2005) (age discrimination claim did not exhaust religious discrimination claim). However, there are exceptions to this rule; for example, a national origin claim can sometimes exhaust racial or religious discrimination if the unstated grounds for discrimination are "closely related" to national origin. Deravin v. Kerik, 335 F.3d 195, 201 (2d Cir. 2003) (national origin can encompass race); see also Sasannejad v. University, 329 F. Supp. 2d 385, 389-91 (W.D.N.Y. 2004) (national origin can encompass religion).

3. But I have no facts before me that would permit finding the applicability or inapplicability of that exception. DC9 has not provided a copy of the actual charge of discrimination that plaintiff filed. It has given me only the EEOC's form 131, which is the notice to the employer that a charge has been filed. That notice has checkmarks only for "race" and "retaliation" under the "circumstances of alleged discrimination," but it is exceedingly sparse. It contains no narrative except "Issues: Discharge, Terms/Conditions" and lists as "Dates" only the date of plaintiff's termination. There is nothing signed by plaintiff, and the form, although it states "See the enclosed for additional information," leaves the box for "Enclosure: Copy of Charge," unchecked. It is signed by the EEOC, but not by plaintiff. In the checklist boxes for "our handling of this charge," the EEOC checked "No action is required by

you at this time," which may explain why the charge contains no substantive information other than the date of plaintiff's termination and that he is pursuing race discrimination and racial retaliation claims.

4. The EEOC requires a signed statement or intake questionnaire in support of a claim, see EEOC, How to File a Charge of Employment Discrimination, https://www.eeoc.gov/employees/howtofile.cfm (last visited Aug. 7, 2017) ("Don't forget to sign your letter. If you don't sign it, we cannot investigate it."), and it provides an exemplary form for a claim (EEOC Form 5), both of which allow for, if they do not require, much more detail than is contained on the employer's notice of claim that DC9 has provided here. There is a strong likelihood that the EEOC had more information than that contained on the employer's notice, and since DC9 has only given me the employer's notice, I deny its motion to limit plaintiff's claim based on the scope of this administrative filing.

5. DC9 next contends that the claim against it should be dismissed for lack of subject matter jurisdiction because plaintiff's administrative claim before the EEOC named only the Finishing Trades Institute ("FTI"), which runs the apprenticeship program, as a defendant, and the EEOC's right to sue letter similarly only references FTI. However, it is not at all clear that FTI is even a juridical entity that can be sued. Its website explains that "The Finishing Trades Institute (FTI) is the education department for the International Union of Painters and Allied Trades and the Finishing Contractors Association." Finishing Trades Institute, What is FTI?, http://www.finishingtradesinstitute.org/what-is-fti/ (last visited Aug. 7, 2017).

6. To the extent FTI is a mere "department" of DC9, it has no legal status and cannot be sued, cf. Darby v. Pasadena Police Dep't, 939 F.2d 311, 313 (5th Cir. 1991) (a plaintiff "no more can proceed against the police department [of a city] alone than [he] could against the

accounting department of a corporation"); Cooper v. Orange Cty., No. 15-cv-10075, 2017 WL 3309754, at *2 (S.D.N.Y. Aug. 2, 2017) (department of municipal corporation cannot be sued), and the administrative claim against it is legally effective notice of the claim to DC9. If it is instead some form of partnership or joint venture between DC9 and the contractors' trade association, which seems more likely, the website nevertheless shows that FTI has an exceedingly close relationship with DC9, as the first hyperlink at the top and bottom of FTI's webpage is entitled "Our Union – IUPTA," which describes DC9 and provides a link to its website. On FTI's letterhead, a copy of which is annexed to the complaint, the DC 9 logo and website appears on the left side, that being a more prominent location than FTI's own logo on the right side. And named-defendant Costas Diamantis, who apparently runs the apprenticeship program, lists his title as "Director of Apprenticeship and Training, DC9/FTI," which also suggests a very close connection.

7. At the very least, there are factual issues as to the application of the "identity of interest" exception to the general rule requiring that a claimant must name a defendant in an administrative charge, an exception established by Johnson v. Palma, 931 F.2d 203 (2d Cir. 1991). See Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1241-42 (2d Cir. 1995); Senecal v. B.G. Lenders Serv. LLC, 976 F. Supp. 2d 199, 213-29 (N.D.N.Y. Sept. 30, 2013); Zhao v. State Univ. of N.Y., 472 F. Supp. 2d 289, 305-06 (E.D.N.Y. 2007); Jackson v. N.Y. City Transit, No. 05-cv-1763, 2005 WL 2664527, at *2 (E.D.N.Y. Oct. 19, 2005); Olvera-Morales v. Sterling Onions, Inc., 322 F. Supp. 2d 211, 215-19 (N.D.N.Y. 2004); Parker v. City of N.Y., No. 04-cv-2257, 2004 WL 2671634, at *3 (E.D.N.Y. Nov. 18, 2004); Dortz v. City of N.Y., 904 F. Supp. 127, 142-44 (S.D.N.Y. 1995). At least one district court has held that under the Johnson framework, naming a partner in an EEOC claim can constitute adequate notice to the partnership,

Schade v. Coty, Inc., No. 00-cv-1568, 2001 WL 709258, at *4-5 (S.D.N.Y. June 25, 2001), and another has held that naming a partnership or joint venture can be adequate as against the individual partners or joint venturers. Abdullajeva v. Club Quarters, Inc., No. 96-cv-0383, 1996 WL 4970209, at *3 (S.D.N.Y. Sept. 3, 1996).

8. DC9 has provided no facts on which I could undertake a Johnson analysis. It has not even submitted an affidavit saying that it lacked notice of plaintiff's EEOC charge, which is telling. In a represented case, I might charge the plaintiff with the failure to demonstrate that he falls within the identity of interest exception. But as the cases cited above suggest, that would be inappropriate in a *pro se* case.

9. DC9 fares no better on its argument that the complaint fails to state a claim. It makes the mistake of trying to saddle plaintiff with the *prima facie* showing required on a motion for summary judgment under McDonnell-Douglas v. Green, 411 U.S. 792 (1973), relying on a couple of older district court opinions that did the same thing. But the Second Circuit has more recently made it clear that plaintiff has no such pleading burden.

10. The Supreme Court had held in Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002), that a plaintiff in a discrimination case need not set forth sufficient facts to state a *prima facie* case in a Title VII complaint. The question arose whether Swierkiewicz remained good law after the Court's subsequent tightening of pleading requirements in Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), with district courts coming out both ways on that issue. The Second Circuit settled the issue in EEOC v. Port Authority of New York & New Jersey, 768 F.3d 247 (2d Cir. 2014), for cases under the Equal Pay Act, and then extended that holding to Title VII claims in Vega v. Hempstead Union Free School District, 801 F.3d 72 (2d Cir. 2015). These cases held that Swierkiewicz survived Iqbal

5

and Twombly because, for one reason, the Supreme Court had cited Swierkiewicz with approval in Twombly. "Twombly's endorsement of Swierkiewicz mandates, at a minimum, that Swierkiewicz's rejection of a heightened pleading standard in discrimination cases remains valid." Vega, 801 F.3d at 84 (quoting, Port Authority, 768 F.3d at 254). Thus, when DC9 urges dismissal in its motion because "[t]he Plaintiff has not established a *prima facie* case," DC9 is advancing the wrong standard.

11. Moreover, as is the case with all *in forma pauperis* complaints, this Court screened plaintiff's complaint under 28 U.S.C. § 1915 when it was first filed to see if it stated a plausible claim before it permitted the issuance of summonses.[1] The Court allowed the claim to go forward because, under the proper plausibility standard from Iqbal and Twombly, plaintiff may have a claim for racial or religious discrimination and retaliation. It takes a close review of the complaint and its attachments to glean the factual allegations on which these claims might be based, but the story ultimately emerges.

12. The claim appears to have its genesis from an incident sometime in 2015, when plaintiff was assigned in his apprenticeship capacity to a job for a company called Xtreme Drywall LLC, which was in turn performing work for a school board. Plaintiff had a conflict with the foreman that involved plaintiff's race or religion. We are not told how it involved plaintiff's race or religion, just that it did. Plaintiff complained about the incident to the EEOC, DC9, and the school board. In addition, he complained to the New York State or federal Department of Labor, and his complaint reached a person named Kimmy Finping So. Ms. Finping So advised plaintiff that she was going to be making a worksite visit to FTI at some

---

[1] Counsel opposing *pro se* complaints filed *in forma pauperis* would do well to remember that in this district and many others, such complaints, pursuant to the statute, are not allowed to proceed unless the Court believes, after a *sua sponte* inquiry, that they state a claim. This should not deter a defendant from seeking dismissal under Rule 12(b)(6), but in making that motion, a defendant should be asking itself how to persuade the Court that its determination to allow the case to proceed was too accommodating to the *pro se* plaintiff.

point in the future. Plaintiff's initial point, however, is that as a result of plaintiff's complaints, Xtreme determined to stop taking on apprentices from FTI, and plaintiff believes, although he offers no specifics, that this was a topic of some conversation at FTI and/or DC9.

13. Beginning in January or February 2016, plaintiff received no more work assignments through the program. He continued to attend classes at FTI through July 2016, at which time he asked defendant Juan Bernal, who is an instructor at FTI, for a leave of absence due to a sudden family emergency. Bernal told him not to worry, that he (Bernal) would take care of it, and, in answer to plaintiff's inquiry, that there was no advance paperwork that plaintiff needed to complete.

14. However, on August 8, 2016, Bernal left plaintiff a voicemail, advising him that plaintiff had to come in to discuss his "reinstatement." This surprised plaintiff because he did not know he had been removed as an apprentice. The voicemail said there would be a "first meeting," a reinstatement orientation for those in plaintiff's position (*i.e.*, former apprentices who had been dropped from the program) on September 12, 2016. Although surprised, plaintiff had no real choice but to proceed as directed.

15. Plaintiff attended the September 12th orientation meeting and completed the attendance form so stating. He was also given a class schedule assigning him to classes with his name on it. He began to attend classes on September 26, 2016.

16. On October 10, 2016, two things happened. One is that plaintiff met with Bernal and filled out an apprenticeship reinstatement form, which stated that plaintiff's reinstatement would be effective as of September 26, 2016. It further stated that plaintiff would be receiving 13 months' credit, although plaintiff thought he was entitled to more.

17. In addition, at the class on that date, participants were asked to orally share "four categories from their personal lives" which were "1) Weaknesses, 2) Strengths, 3) Core Values and 4) Personal challenges." When plaintiff's turn came, he stated "Family, Honesty, Loyalty, My Faith/religion, and prayer." Bernal asked plaintiff what his religion was, and why he called himself "brother," and although it is not specifically alleged, the inference is that plaintiff disclosed that he was Muslim. Bernal then told everyone in the class that plaintiff had filed complaints, apparently referring to the Xtreme complaints, alleging religious discrimination. Bernal did not ask anybody else what religion they observed.

18. In addition, during one of the other student's "sharing" presentation, that student stated he had been dropped from the apprenticeship program for disrespecting its rules, being rude and disrespectful to the instructors, and not attending classes. That student expressed "grat[itude] for being allowed to be reinstated into the program after all [that] he did [] wrong as an apprentice."

19. Later, by letter dated October 18, 2016, plaintiff wrote to Diamantis, whose title, it will be recalled, is "Director of Apprenticeship & Training, DC9/FTI," to inquire, among other things, why he was only receiving 13 months' credit.

20. On November 7, 2016, when plaintiff appeared to attend class, Bernal rudely removed plaintiff from class and advised him that he was no longer an apprentice and had to leave the building immediately. In fact, although plaintiff had not yet received it, Diamantis had sent him a letter dated October 28, 2016, in response to plaintiff's letter of October 18, 2017, advising him to the same effect. The Diamantis letter stated that plaintiff had asked to be dropped from the program as of March 29, 2016, but this was not true; rather, as noted above, plaintiff had requested an emergency personal leave in July and had never asked to be dropped

from the program. Finally, the letter stated that FTI had reviewed plaintiff's work history and absences and determined that based on that review, he would not be reinstated.

21. To this picture, plaintiff adds one other factual allegation: Ms. Finping So from the DOL was scheduled to make her worksite visit on November 7, 2016, the same day he was unceremoniously removed from the building.

22. All of these allegations must be accepted as true for purposes of a Rule 12(b)(6) motion. Viewed in that manner, they adequately cross the Iqbal/Twombly line from possible to plausible. Plaintiff's basic point is that his termination for alleged non-attendance was pretextual; it was actually in retaliation for his having undertaken protected activity – the making of a discrimination complaint – against Xtreme for its foreman's racially- or religiously-based disparagement.

23. The inference that plaintiff seeks to draw is that DC9 resented plaintiff having made these complaints because they resulted in the loss of a placement opportunity for its apprentices. That inference is supported by the facts that (1) plaintiff never received a warning or notice that he had been dropped from the program until some over four months after it occurred; (2) plaintiff denies having (or at least knowing about) any attendance problem; and (3) during that period, FTI, through Bernal, continued to work with him as if he were still in the program. Even in August, 2016, when Bernal finally told him that he had been dropped, resulting in a punishment of no work for six months (although plaintiff did not know he was being retaliated against), plaintiff was invited back in and attended classes as if he were going to be reinstated. Thus, a plausible inference can be drawn of retaliation.

24. An additional incident of discrimination or retaliation can be plausibly inferred from the fact that after his "punishment" period, plaintiff was allowed to continue to attend class

9

pending his reinstatement, and he was only barred when he disclosed, in response to Bernal's questions in class the following October, that he was an observant Muslim. There was no greater attendance problem going on in October than there had been in August, when Bernal had invited him to be reinstated. Rather, what had changed was plaintiff's declaration of his religious persuasion in response to being questioned publicly by Bernal. Plaintiff's allegations circumstantially support this conclusion because (1) no other member of the class was asked about their religion; and (2) another member of the class, who not only actually had an attendance problem but who had been dismissed from the program for being rude to FTI faculty, was granted reinstatement. Liberally construing plaintiff's complaint, this is an adequate comparable for pleading purposes.

25. Finally, the fact that Ms. Finping So was embarking on a site visit at FTI on the same day that plaintiff was banned from the building further supports the inference that DC9 did not want him communicating his past grievances to Ms. Finping So, particularly when, by that point, DC9 had determined that plaintiff would not be reinstated.

26. Instead of applying the fundamental principle that the facts have to be viewed in the light most favorable to plaintiff, DC9's motion reverses it. It asserts, for example, that "[t]he reason Plaintiff had been dropped from the Apprentice Program on March 29, 2016 was because he had four accrued absences." Well, that's the issue, isn't it? If DC9 is correct, it raises questions of why plaintiff was not warned; why he was not notified until August; and why Bernal continued to work with him throughout the period from March through November as if plaintiff was an apprentice. DC9 has simply ignored the factual allegations which give rise to an inference of discrimination.

27. I am not saying that plaintiff's claims will ultimately succeed. The facts underlying his claims may be wrong, and the required inferences may fail when considered in light of other facts adduced during discovery. But under the applicable standard, especially in light of plaintiff's unrepresented status, the complaint meets the test of plausibility.

28. DC9's last point is that plaintiff's claim under Title 8 of the New York City Administrative Code should be dismissed for the same reasons his Title VII claim should be dismissed. Having rejected its challenge to the Title VII claims, this point is moot.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
        August 7, 2017